IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Paul S. Diamond |
| | : | |
| v. | : | Criminal No. 06-112 |
| | : | |
| ARTHUR D'AMARIO | : | |

Diamond, J.                                                                                    March 26, 2007

### M E M O R A N D U M

On December 15, 2006, after a five day trial, a jury convicted Defendant Arthur D'Amario of threatening to murder the Honorable Joseph E. Irenas of this Court. 18 U.S.C. § 115(a)(1)(B). Judge Irenas had presided over D'Amario's 2001 trial, when D'Amario was convicted of threatening to murder yet another federal judge, the Honorable Joseph DiClerico of the District of New Hampshire.

Defendant has moved for a judgment of acquittal or in the alternative for a new trial on a variety of grounds. For the reasons that follow, I deny D'Amario's motions.

### I.       Background

After D'Amario's 2001 conviction -- and a remand requiring the imposition of a sentence within the then-mandatory Guidelines -- Judge Irenas sentenced D'Amario to a jail term of thirty months. See United States v. D'Amario, 350 F.3d 348 (3d Cir. 2003); D'Amario v. United States, 403 F. Supp. 2d 361 (D. N.J. 2005).

At the conclusion of that term, D'Amario was placed on supervised release. In March 2005, he violated supervised release and was sentenced to twelve months imprisonment. On February 10, 2006 Defendant was to begin serving a four month term of supervised release at a

1

halfway house – something D'Amario strongly wanted to avoid.  (12/14/06 Tr. at 94-97.)

Defendant believed that if he served an additional thirty days imprisonment (to March 12, 2006),

he would not have to serve any supervised release.  (12/14/06 Tr. at 90-91.)  Accordingly, in

January 2006 – while still in prison – D'Amario filed with Judge Irenas two documents: (1) a

"Motion to Revoke Supervised Release"; and (2) a supporting "Memorandum," in which

D'Amario wrote as follows:

> Defendant is serving sentences imposed in the districts of Rhode Island and New
> Jersey. ... If discharged on Feb. 10, he will violate the same day.  Fourteen months
> ago, upon finding that Defendant is violent, dangerous, schizophrenic, and
> determined to get a gun, Judge Smith employed ... 3583(e)(2) to revoke/modify
> his supervised release ....  The court should heed the warning of Justice Alito ...
> that Defendant is extremely dangerous. ... He will not serve probation.  He will
> not take orders from federal judges and probation officers.  It is safer to revoke
> his supervision now, and extend his detention, than to speculate on how this
> "schizophrenic" who passionately hates NJ judges will react to sudden liberty on
> Feb. 10.

(Ex. G-1.)

After the Marshal's Office conducted a threat assessment of the Memorandum at Judge

Irenas's request, the Government charged D'Amario with threatening a federal judge in violation

of 18 U.S.C. § 115(a)(1)(B), which provides as follows:

> Whoever ... threatens to assault, kidnap, or murder ... a United States judge ...
> with intent to impede, intimidate, or interfere with such ... judge ... while engaged
> in the performance of official duties, or with intent to retaliate against such ...
> judge ... on account of the performance of official duties, shall be punished as
> provided in subsection (b).

18 U.S.C. § 115(a)(1)(B).

On March 9, 2006, I was assigned to preside over this case and designated as a member

of this Court.  On March 29, 2006, I appointed Ralph Jacobs, Esquire, to represent D'Amario.

On April 18, 2006, over D'Amario's vigorous objection, I ordered him to undergo a mental

health evaluation. On June 16, 2006, I found him competent to stand trial. After conducting the required colloquy, I granted D'Amario's request to represent himself and appointed Mr. Jacobs to serve as stand-by counsel. See United States v. Peppers, 302 F.3d 120, 136-37 (3d Cir. 2002).

Defendant contended that under the Supreme Court's decision in Virginia v. Black, his Memorandum could not, consistent with the First Amendment, be considered a "true threat" unless the Government proved that Defendant actually intended to murder Judge Irenas. 538 U.S. 343, 358-60 (2003). As I explain below, after extensive briefing and argument, I ruled that whether Defendant's Memorandum conveyed a "true threat" would be determined under an "objective recipient" standard. United States v. D'Amario, 461 F. Supp. 2d 298 (D. N.J. 2006).

D'Amario's trial was set to begin on December 5, 2006. On December 4, 2006, Defendant requested a continuance to secure the presence of Scott Gabriele (a potential witness). Over the Government's objection, I granted D'Amario's request and rescheduled the commencement of trial to December 11, 2006.

On December 8, 2006, Defendant indicated that he no longer wished to represent himself, and asked that I allow Mr. Jacobs to represent him. After determining that Mr. Jacobs was prepared to represent D'Amario at trial, I granted Defendant's request.

Trial began on the morning of December 11, 2006. The Government elected not to call Judge Irenas as a witness. After the prosecution rested its case on the afternoon of December 13th, Mr. Jacobs indicated that he and Defendant disagreed as to whether D'Amario would call the Judge as a witness. (12/13/06 Tr. at 144 et seq.) D'Amario initially indicated that he might ask to represent himself so that he could call Judge Irenas. On the morning of December 14th,

3

however, D'Amario stated that he did not wish to represent himself and that he accepted Mr. Jacobs's recommendation not to call the Judge as a witness. (12/14/06 Tr. at 11-12, 105-07.)

On December 15, 2006, the jury found D'Amario guilty of threatening to murder Judge Irenas.

## II.     The Motion for Judgment of Acquittal

D'Amario has moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 on two grounds: (1) the trial evidence was insufficient to sustain his conviction; and (2) the Memorandum was protected by the First Amendment. I will consider only the first ground, as it is the only basis on which I may grant a motion for judgment of acquittal. Fed. R. Crim. P. 29(a); see also United States v. Clemons, 658 F. Supp. 1116, 1118 (W.D. Pa. 1987), aff'd, 843 F.2d 741 (3d Cir. 1988); 2A Charles Alan Wright, Federal Practice and Procedure § 466 (3d ed. 2000) ("There is only one ground for a motion for a judgment of acquittal. This is that the evidence is insufficient to sustain a conviction of one or more of the offenses charged in the indictment or information.") (internal quotation omitted). In any event, in light of the jury's determination that the Memorandum was a "true threat," it has no First Amendment protection. See United States v. Kosma, 951 F.2d 549, 553 (3d Cir. 1991).

### A.     Legal Standards

A defendant challenging the sufficiency of the evidence bears a heavy burden. Granting relief under Rule 29 is "confined to cases where the prosecution's failure is clear." United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984). I must view the evidence in the light most favorable to the Government; I may not re-weigh the evidence or make credibility determinations. United States v. Giampa, 758 F.2d 928, 934-35 (3d Cir. 1985). Relief is warranted only "if no

4

reasonable juror could accept the evidence as sufficient to support the conclusion of the Defendant's guilt beyond a reasonable doubt." United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1986) (citing United States v. Castro, 776 F.2d 1118, 1125 (3d Cir. 1981)).

To secure Defendant's conviction, the Government was required to prove three elements: (1) that D'Amario made a threat to assault or murder; (2) a federal judge; and (3) that D'Amario acted with the intent to impede, intimidate, or interfere with that judge's performance of official duties, or with the intent to retaliate against that judge on account of the judge's performance of official duties. 18 U.S.C. § 115(a)(1)(B); see United States v. Stewart, 420 F.3d 1007, 1015 (9th Cir. 2005); United States v. Fenton, 30 F. Supp. 2d 520, 523-24 (W.D. Pa. 1998) (Smith, J.).

### B.   The Trial Evidence

Once again, neither side called Judge Irenas at trial. See United States v. Roberts, 915 F.2d 889, 891 (4th Cir. 1990) ("While a relevant consideration is whether 'an ordinary reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury,' there is no requirement that the actual recipient testify.") (internal citation omitted); United States v. Johnson-El, 89 F.3d 836, No. 95-1142, 1996 WL 367596, at *3 (6th Cir. July 1, 1996) ("[I]t is not imperative for the recipient of a letter to testify, so long as the jury is presented with sufficient evidence to determine how a reasonable recipient under the circumstances would react."). Nonetheless, both sides presented similar kinds of evidence to support their contentions.

The Government presented three categories of trial evidence: (1) the Memorandum itself (Ex. G-1); (2) the Memorandum's context (see, e.g., 12/12/06 Tr. at 57-118, 123, 140, 146-64,

185-98; 12/13/06 Tr. at 17-41, 49, 60-81, 94); and (3) Judge Irenas's reaction to the Memorandum (see, e.g., 12/12/06 Tr. at 172-79, 183; 12/13/06 Tr. at 119-39).

Defendant did not dispute that he authored and sent the Memorandum to Judge Irenas, nor did he dispute that Judge Irenas was a federal judge within the meaning of § 115. (12/13/06 Tr. at 53.) Rather, D'Amario argued that the Memorandum was not threatening, but sarcastic or humorous, and that he did not have the requisite intent. In support, D'Amario offered three categories of evidence: (1) the Memorandum itself (Ex. G-1); (2) the Memorandum's context (see, e.g., 12/13/06 Tr. at 151-58); and (3) Judge Irenas's state of mind respecting D'Amario (see, e.g., 12/13/06 Tr. at 160-69, 183).

The trial evidence is sufficient to sustain Defendant's conviction. The Memorandum itself is unquestionably threatening: D'Amario urged Judge Irenas to "heed" his "warning" that unless the Judge "revoked" D'Amario's supervised release, on February 10, 2006, D'Amario – who "passionately hates NJ judges," and is "extremely dangerous" and "violent" – would "get a gun" and "violate the same day." (Ex. G-1.)

The Government also showed that Judge Irenas was familiar with Defendant's criminal record. Thus, Judge Irenas knew that the individual who described himself as "extremely dangerous" and "determined to get a gun" in fact had been convicted of crimes involving weapons and violence, had twice before violated supervised release, and had previously threatened to murder a federal judge.

Finally, the Government introduced evidence of Judge Irenas's reaction to the Memorandum. See United States v. Davila, 461 F.3d 298, 305 (2d Cir. 2006) (under an "objective recipient" standard, "proof of the effect of the alleged threat upon the addressee is

highly relevant") (quoting United States v. Malik, 16 F.3d 45, 49 (2d Cir. 1994)); United States
v. Nishnianidze, 342 F.3d 6, 16 (1st Cir. 2003) (under an "objective recipient" standard, "the
fact-finder may consider ... the effect of the statement on the recipient"). When Judge Irenas
received the Memorandum, he became concerned and summoned the Deputy Marshal in charge
of judicial security to discuss the Memorandum. (12/12/06 Tr. at 175-76; 12/13/06 Tr. at 123-
27.) At Judge Irenas's request, the Marshal's Office then conducted the threat assessment of the
Memorandum. (12/13/06 Tr. at 127-39.) The Government also showed that shortly after
receiving the Memorandum, Judge Irenas had a security system installed in his home. (12/13/06
Tr. at 139.)

Viewed in the light most favorable to the Government, the trial evidence shows that
Defendant threatened to obtain a gun and kill Judge Irenas if the Judge did not "revoke"
D'Amario's supervised release. The Government thus proved all three elements of § 115: that
Defendant made a threat to murder a federal judge, intending to interfere with or intimidate the
judge in the performance of his official duties. 18 U.S.C. § 115; see also Stewart, 420 F.3d at
1015; United States v. Gothard, 31 Fed. App'x 585, No. 01-30214, 2002 WL 464710 at *1 (9th
Cir. 2002).

Contending that the trial evidence does not sustain his conviction, Defendant argues – as
he did to the jury – that his "sarcastic memorandum of law" cannot constitute a threat. (Doc. No.
166 at 3.) I disagree. It was entirely within the jury's province to reject D'Amario's
characterization of the Memorandum. See Sheridan v. E.I. DuPont de Nemours and Co., 100
F.3d 1061, 1071-72 (3d Cir. 1996); United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991).

In these circumstances, the evidence is sufficient to support D'Amario's conviction.

### III.    The Motion for a New Trial

D'Amario also has moved for a new trial pursuant to Fed. R. Crim. P. 33 on the following grounds: (1) the admission of prejudicial evidence; (2) the prosecution's use of inflammatory evidence and arguments; (3) my refusal to allow D'Amario to call a defense witness; (4) improper jury instructions; (5) the prosecution's improper summation; (6) the prosecution's failure to provide required discovery; and (7) after-discovered evidence.

I may grant a defendant's motion for a new trial if the interests of justice so require. See Fed. R. Crim. P. 33(a). Such motions should be granted sparingly and only where the failure to do so would result in a miscarriage of justice. See United States v. Copple, 24 F.3d 535, 547 n. 17 (3d Cir. 1994). In considering a Rule 33 motion, I "may weigh the evidence, but may set aside the verdict and grant a new trial only if" I determine that the verdict constitutes a miscarriage of justice, or that a trial error had a substantial influence on the verdict. United States v. Stewart, 325 F. Supp. 2d 474, 485 (D. Del. 2004); United States v. Enigwe, No. 92-00257, 1992 WL 382325 at *4 (E.D. Pa. Dec. 9, 1992) (citation omitted). In contrast to motions for judgment of acquittal under Rule 29, a motion for a new trial does not require me to view the evidence in the light most favorable to the Government. Rather, I must weigh the evidence and evaluate the credibility of witnesses. See United States v. Rennert, No. 96-51, 1997 WL 597854 at *17 (E.D. Pa. Sept. 17, 1997) (citing United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985)).

### A.    Admission of Allegedly Prejudicial Evidence

Defendant contends that I erroneously admitted evidence of his criminal record.   I allowed the Government to present this evidence for three limited purposes: (1) to establish that the Memorandum was a "true threat"; (2) to prove Defendant's criminal intent; and (3) to show Defendant's motive in sending the Memorandum to Judge Irenas.   See Fed. R. Evid. 404(b) ("[e]vidence of other crimes ... may ... be admissible [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

As I have described, Defendant contended that under the First Amendment, his Memorandum could not be a "true threat" unless D'Amario actually intended to murder Judge Irenas.   See Virginia v. Black, 538 U.S. 343, 358-60 (2003).   I concluded that under the Third Circuit's interpretation of a closely analogous statute in United States v. Kosma and related authority, an utterance is a "true threat" if

> the defendant intentionally make[s] a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or take the life of the [threatened person], and if the statement [is not] the result of mistake, duress, or coercion.   The statute does not require that the defendant actually intend to carry out the threat.

951 F.2d at 557; United States v. D'Amario, 461 F. Supp. 2d 298 (D. N.J. 2006).

Under this "objective recipient" standard, the jury was required to determine whether a reasonable person in Judge Irenas's position would have viewed the Memorandum as a threat. See United States v. Martin, 163 F.3d 1212, 1216 (10th Cir. 1998); United States v. Malik, 16 F.3d 45, 49-50 (2d Cir. 1994); United States v. Roberts, 915 F.2d 889, 891 (4th Cir. 1990). Having sentenced Defendant three times, Judge Irenas had repeatedly reviewed D'Amario's

presentence investigation report and so well knew Defendant's criminal record. (12/12/06 Tr. at 84; 12/14/06 Tr. at 141-42.) Accordingly, I allowed the Government to introduce evidence of Defendant's criminal history, including the presentence investigation report. That evidence revealed, inter alia, Defendant's prior convictions for threatening Judge DiClerico, being a felon in possession of a firearm, simple assault, and violation of a state Abuse Prevention Act. (Ex. G-15.) It also revealed D'Amario's two prior violations of supervised release, and his arrests for carrying a concealed pistol, assault, concurring in the use of a forged document purporting to be a federal district court judge's order, obstructing the judicial system, threats to a public official, resisting arrest, and violation of a protection order. (Id.)

In additional, having presided over Defendant's 2001 trial, Judge Irenas was aware of D'Amario's previous threat against Judge DiClerico, in which he stated:

> [I]f they make me work one more day, and continue to fuck up my sentence computation, I will seek revenge on the day of my inevitable discharge against the conspirators. As soon as I get off the bus in Providence next month or next year, I will kill the judges who directed the state police to frame me with those nursery rhymes. I may charge after one and break his neck with my bare hands, or I might douse myself with gasoline and light the match next to a judge, or I may get a gun and shoot them all....
> As I said, you must understand how sick I am of losing, and that I will not accept this latest conspiracy. The co-conspirators are:
> 1. R.I. judges
> 2. Mass. Judges
> 3. DiClerico
> 4. [The AUSA in the District of Rhode Island]
> [12 others]
> So the way we left it is that nobody had better push me or I'll explode. 'Leave me the fuck alone!' I said, or I'll kill somebody. I also said that I will not do this time and plan to beat the judges however I can even if it means hanging myself....
> But they have to let me out eventually. I've told them where we're at. If they don't drop these terror tactics immediately, I'm dedicated to killing R.I. judges when I'm out. I'll put the conspirators on the front page.... I dare anybody to push me. You can accept all they've done to me in this hoax case. I won't. If

I'm in S.H.U. when this arrives, I expect you to call these cocksuckers and demand my release. They have no authority over me anymore. Arthur.

(Ex. G-11.)

Having conducted a balancing test under Fed. R. Evid. 403, I concluded that this evidence was essential to the jury's determination of whether the Memorandum was a "true threat." Fed. R. Evid. 403, 404. The jury simply could not determine whether it would have been reasonable for Judge Irenas to view the Memorandum as a threat unless the jurors shared the Judge's knowledge of Defendant. See Malik, 16 F.3d at 50.

Similarly, I concluded that under Rules 403 and 404, evidence of Defendant's criminal record was essential to prove his criminal intent. D'Amario knew that the Judge was quite familiar with Defendant's criminal record. (See, e.g., 12/14/06 Tr. at 109, 113, 141-45.) Indeed, D'Amario implicitly refers to his record in the Memorandum. (See Ex. G-1 ("It is safer to revoke his supervision ... than to speculate on how [Defendant] will react to sudden liberty....").) The Government was entitled to show that D'Amario sent the Memorandum because he understood that the language he employed combined with Judge Irenas's knowledge of Defendant's record would certainly intimidate the Judge – making it more likely that he would "revoke" Defendant's supervised release.

Finally, the Government was entitled to prove D'Amario's motive. See United States v. Sriyuth, 98 F.3d 739, 747 n. 12 (3d Cir. 1996) ("motive is always relevant in a criminal case, even if it is not an element of the crime"). The prosecution sought to show that D'Amario sent the Memorandum to Judge Irenas because he strongly wanted to remain in prison for thirty additional days and so avoid serving a term of supervised release. (12/15/06 Tr. at 10.) The jury could make sense of this contention only if it understood Defendant's criminal record: that

11

D'Amario had been previously convicted, had served terms of supervised release, and had violated supervised release. Accordingly, I again concluded that under Rules 403 and 404, the probative value of this evidence outweighed its prejudicial impact.

My admission of Defendant's criminal record was in keeping with well-settled rulings in threat cases allowing the Government to show the context in which the alleged threats were made. See United States v. Johnson-El, 89 F.3d 836, No. 95-1142, 1996 WL 367596 at *2-3 (6th Cir. 1996); Malik, 16 F.3d at 49; United States v. Davis, 876 F.2d 71, 73 (9th Cir. 1989); United States v. Prochaska, 222 F.2d 1, 2 (7th Cir. 1955).

Moreover, at Defendant's request, I repeatedly gave limiting jury instructions respecting Defendant's criminal record. (See, e.g., 12/12/06 Tr. at 63-64; 12/13/06 Tr. at 103-04; 12/14/06 Tr. at 179-80.) For instance, in my final instructions, I stated as follows:

> You have heard evidence of the defendant's prior criminal record. You have also heard evidence and received documents pertaining to that record. I instruct you that this evidence was introduced for three reasons. You may consider that evidence only for any or all of those reasons. ... The first reason is to permit you to determine what information was known to Judge Irenas in January 2006 when the allegedly threatening communication in this case was allegedly sent to Judge Irenas by the defendant. As I previously instructed you, information known to Judge Irenas at that time is relevant to your determination of whether or not the communication at issue was a true threat. The second reason why this evidence was admitted is because it was relevant to your determination of whether the defendant did or did not intend to impede, intimidate, or interfere with Judge Irenas. The third reason why this evidence was admitted is because it is relevant to your determination of the defendant's motive in sending the January 2006 Memorandum, Government Exhibit 1.

(12/14/06 Tr. at 179-80.) I also emphasized that the jury could not make any other use of this evidence:

> I caution you, however, that you may not consider any evidence regarding any of the defendant's prior criminal conduct for any other purpose. In particular, you may not conclude, based on that evidence or otherwise, that the defendant is a bad

> person or that he was predisposed to commit the charged crime in this case. The defendant is not on trial for any acts or crimes not alleged in the Indictment. Nor may the defendant be convicted of the crime charged even were you to find that he committed other crimes, even crimes similar to the one charged in the indictment.

(Id. at 180.)  There is a presumption that the jury will obey my instructions.  See United States v. Cross, 308 F.3d 308, 327 (3d Cir. 2002) (citing Zafiro v. United States, 506 U.S. 534, 541 (1993)); United States v. Edmonds, 80 F.3d 810, 825 (3d Cir. 1996) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

In sum, the meaning of words often reflects the circumstances in which they are uttered and the person who utters them.  I am well aware of the dangers of admitting prior crimes evidence.  In the unique circumstances presented here, however, I feel strongly that the jury could not fully understand the words Defendant used in his Memorandum unless it understood – as Judge Irenas understood – the circumstances in which they were uttered and the man who uttered them.

### B.   Prosecution's Allegedly Unfair Use of Inflammatory Evidence and Arguments

D'Amario next argues that the Government's alleged use of "inflammatory" material "overwhelmed" the jury.  Defendant apparently refers to: (1) a letter D'Amario wrote to "Mr. DeMaria" of the Rhode Island Attorney General's Office; and (2) a "Notice of Intent to Injure" that Defendant filed with the United States District Court in the District of Rhode Island.  (See Ex. G-51; Ex. G-52.)

During his direct testimony, D'Amario explained that his Memorandum to Judge Irenas was not threatening, but merely "sarcastic."  (12/14/06 Tr. at 98, 101-04.)  He sought to

introduce a letter that he had written to the Providence Journal to reiterate to the jury that he used language sarcastically. (Ex. D-2.) (12/15/06 Tr. at 3.)

In cross-examining Defendant, the Government sought to impeach this testimony with four other documents D'Amario had also written. Although Defendant conceded that the writings were relevant (12/14/06 Tr. at 120), he argued that their prejudicial impact outweighed their probative value. I excluded two of the documents under Rule 403, but allowed the Government to impeach Defendant with his letter to DeMaria and his "Notice of Intent to Injure." (12/14/06 Tr. at 160-65.)

In the DeMaria letter, Defendant wrote that Rhode Island Deputy Attorney General Jametta Austin will "be moving to a cemetery, because I'm bringing in some professional gunmen from Chicago to assassinate her. It's going to be done in Kennedy Plaza with hundreds of witnesses to send a message." (Ex. G-51.)

Defendant filed his "Notice of Intent to Injure" in connection with civil litigation pending in the Rhode Island federal court. D'Amario stated that "any further intimidation of witnesses, libel and slander, theft of press passes, refusal of admission to the Civic Center, or harassment of any kind against the plaintiff [D'Amario] by Frank Russo and his agents will necessitate an attempt on the physical well-being of alleged human Russo." (Ex. G-52.)

Both documents were plainly admissible. First, Judge Irenas was familiar with both documents. (See Ex. G-17B at 104; Ex. D-5 at 26.) Accordingly, they were relevant to the jury's determination of whether D'Amario's Memorandum was a "true threat."

Moreover, just as Defendant wished to use Defendant's Providence Journal letter to buttress his testimony that he intended the Memorandum to be sarcastic, the Government was

entitled to use D'Amario's other writings to impeach Defendant and show that he well understood threatening language and intended the Memorandum to be intimidating. In fact, that is exactly how the Government used those writings in cross-examining Defendant. (See, e.g., 12/14/06 Tr. at 161 *et seq.*)   Once again, I believe the probative value of this evidence outweighed its prejudicial impact. See Fed. R. Evid. 403; see also United States v. Lafferty, 372 F. Supp. 2d 446, 464-64 (W.D. Pa. 2005); United States v. Frezzo, No. 86-527, 1987 WL 7396 at *1 (E.D. Pa. March 3, 1987). Accordingly, the use of this evidence to impeach Defendant does not warrant a new trial.

**C.     Court's Alleged Refusal to Allow Defendant to Call Dr. Carter as a Witness**

Dr. William R. Carter is a psychologist at the United States Medical Center for Federal Prisoners in Springfield, Missouri – the facility where D'Amario was incarcerated when he wrote and sent his Memorandum. Defendant proffered that Dr. Carter would testify that: (1) D'Amario often displayed a sarcastic attitude toward the federal judiciary; and (2) Dr. Carter had determined that Defendant was suffering from no major mental illness.

On December 11, 2006, I conducted a hearing pursuant to Fed. R. Evid. 104 to determine the admissibility of Dr. Carter's proposed testimony. Dr. Carter participated in the hearing by telephone and testified that he recalled that D'Amario was generally sarcastic about the federal judiciary. (12/11/06 Tr. at 11.) Dr. Carter also indicated that he was part of a Risk Assessment panel that concluded that D'Amario did not have any major mental illness. (Id. at 13.)

The Government stipulated to Dr. Carter's testimony respecting the Risk Assessment. (12/11/06 Tr. at 17-19, 31-32.) I ruled that Dr. Carter's description of Defendant's hearsay statements was neither relevant nor otherwise admissible. See Fed. R. Evid. 401, 802; see also

15

United States v. Logan, 49 F.3d 352, 358 (8th Cir. 1995); United States v. Avery, No. 04-819, 2005 WL 1869164 at *4-6 (E.D. Pa. Aug. 3, 2005). I continue to believe that ruling was correct and does not warrant the granting of a new trial.

### D.   Allegedly Improper Jury Instruction

Defendant once again contends that my determination of what constitutes a "true threat" was incorrect, and that this error was repeated in my final jury instructions. I have already explained why I believe that determination was correct. See United States v. D'Amario, 461 F. Supp. 2d 298 (D. N.J. 2006). Accordingly, I reject Defendant's contention that my instruction to the jury was incorrect.

### E.   Prosecution's Allegedly Improper Summation

D'Amario next contends that the Government's closing argument was improper for two reasons.

First, he claims the Government improperly referred to D'Amario's failure to adduce evidence by commenting on Defendant's decision not to call Judge Irenas as a witness. During his closing argument, the prosecutor stated:

> Now, while the defense has no burden to put on a defense, they don't have to do anything, the United States must prove its case, but the defense did put on a defense here. They called Scott Gabriele, former inmate, they called Lori Koch, the attorney from the prior case, they called the defendant. Judge Irenas was equally available to both sides. The defense chose not to call Judge Irenas as well. Now, the defendant wasn't shy. Mr. Gabriele came in from out of state, he testified. The defendant wasn't shy about calling Lori Koch either even though the defendant had filed a complaint against her. And you might think there might be some confrontation, some hostility, the defendant still called her. So Judge Irenas was equally available to both sides. You can't speculate on what Judge Irenas would have testified to if he had been called. You have the evidence of the judge's reactions, apply the reasonable person test.

(12/15/06 Tr. at 31-32.)

16

This was a correct statement of the law.  United States v. Fisher, 484 F.2d 868, 870 (4th Cir. 1973); United States v. Chapman, 435 F.2d 1245, 1247 (5th Cir. 1970); United States v. D'Angiolillo, 340 F.2d 453, 457 (2d Cir. 1965).  Indeed, I gave this instruction to the jury without objection from Defendant:

> If it is peculiarly within the power of either the government or the defense to produce a witness who could give relevant testimony on an issue in the case, failure to call that witness may give rise to an inference that this testimony would have been unfavorable to that party.  No such conclusion should be drawn by you, however, with regard to a witness who is equally available to both parties or where the testimony of that witness would merely be repetitive or cumulative.

(12/14/06 Tr. at 180.)

Moreover, insofar as the prosecutor implied in his closing that Defendant failed to call Judge Irenas as a witness, this was permissible.  The Government "may not comment on a defendant's failure to testify and may not improperly suggest that the defendant has the burden to produce evidence."  United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996) (citing United States v. Parker, 903 F.2d 91, 98 (2d Cir. 1990); United States v. Drake, 885 F.2d 323, 323-24 (6th Cir. 1989)).  There is, however, "nothing improper about a prosecutor 'attempt[ing] to focus the jury's attention on holes in the defense's theory.'"  United States v. Lore, 430 F.3d 190, 213 (3d Cir. 2005) (quoting Balter, 91 F.3d at 441).  "Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or improperly suggests that the defendant has the burden of producing evidence."  Id.; see also United States v. Kelly, 991 F.2d 1308, 1314 (7th Cir. 1993) ("[C]ommenting on a defendant's failure to call or ask particular questions of a witness 'does not have the effect of shifting the burden of proof unless it taxes the exercise of the defendant's right not to testify....'") (quoting United States v. Dahdah, 864 F.2d 55, 59 (7th Cir. 1988), cert. denied, 489

17

U.S. 1087 (1989)); United States v. Gotchis, 803 F.2d 74, 81 (2d Cir. 1986) ("where defense counsel himself has suggested the alternative theory that the prosecutor then undertakes to debunk," precluding comments on the absence of evidence to rebut the Government's case "would place especially undesirable constraints on the government").

Defendant had suggested his own theory of the case: that his Memorandum was merely sarcastic and that Judge Irenas could not have found it to be threatening.  The prosecutor was entitled to attack Defendant's theory by noting that Defendant did not call Judge Irenas to confirm it.  See United States v. Brennan, 326 F.3d 176, 188 (3d Cir. 2003) (prosecutor's "remarks about the defense's failure to call anyone who knew anything about the case" were not improper); Lore, 430 F.3d at 213; see also United States v. Hobbs, 190 Fed. App'x. 313, 315 (4th Cir. 2006) ("[A] prosecutor's mention of a defendant's failure to refute evidence does not violate a defendant's right against self-incrimination.").  Significantly, the Government properly informed the jury that the defense did not have a burden to put on a defense.  In addition, I gave the following instruction to the jury:

> You must always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

(12/14/06 Tr. at 180.)  In these circumstances, I will not grant D'Amario a new trial on this basis.

D'Amario next contends that during his closing argument, the prosecutor erroneously attributed personal views to Judge Irenas that were actually the Judge's legal conclusions.  During trial both sides made contentions respecting Judge Irenas's state of mind. Fed. R. Evid. 803(3) ("[a] statement of the declarant's then existing state of mind" is not hearsay).  Transcripts

18

of Defendant's 2001 trial and subsequent sentencings were admitted into evidence during the instant trial, and both Defendant and the Government liberally quoted statements Judge Irenas made about D'Amario during the earlier proceedings. (See, e.g., 12/12/06 Tr. at 121-22, 140-45; 12/15/06 Tr. at 44-45.)  Among those was the 2001 transcript of the Rule 29 hearing during which Judge Irenas stated, inter alia, that a reasonable juror could find D'Amario's prior statements to be threatening.  (12/14/06 Tr. at 145-48.)

Before the Government's closing argument, Defendant raised what he described as a "subtle distinction," and orally moved for an order barring the prosecutor from suggesting that Judge Irenas's legal conclusions as to what a reasonable juror could find were actually Judge Irenas's personal views respecting Defendant's prior threats.  (12/15/06 Tr. at 6-9.)  Although some of Judge Irenas's comments were legal conclusions, in an abundance of caution, I was prepared to order the prosecutor to describe Judge Irenas's comments as either his personal views or his legal conclusions – whichever Defendant preferred.  (Id.)  Defendant then reconsidered his request, doubting the wisdom of requiring the prosecutor to inform the jury that Judge Irenas had concluded that reasonable jurors could find Defendant's earlier statements to be threatening.  Accordingly, Defendant withdrew his oral motion.  (Id.)  That withdrawal notwithstanding, after the Government's closing, Defendant objected that the prosecutor had mischaracterized as Judge Irenas's personal views the Judge's legal conclusions that reasonable jurors could find Defendant's earlier statements to be threatening.  He now renews that objection in his Motion for a New Trial.

First, in light of the withdrawal of his oral motion, I believe Defendant has waived this issue.  In declining to choose a characterization of Judge Irenas's comments – legal conclusions

or personal views – Defendant effectively withdrew his objection to either. See Fed. R. Crim. P. 51; United States v. Polack, 442 F.2d 446, 446-47 (3d Cir. 1971) (failure to raise timely objection to prosecutor's summation, except in cases of flagrant abuse, will bar defendant from raising the point on appeal); see also United States v. Jones, 404 F. Supp. 529, 539 (E.D. Pa. 1975).

In any event, assuming the objection respecting this "subtle distinction" is preserved, it is meritless. In his closing, the prosecutor briefly discussed the Rule 29 proceeding and quoted the transcript directly. (12/15/06 Tr. at 13.) I do not believe the prosecutor misled the jury or prejudiced Defendant.

Accordingly, I will not grant D'Amario a new trial on this basis.

### F.    Prosecution's Alleged Failure to Provide Required Discovery

D'Amario alleges that on September 13, 2006, while the Government was transporting him to the Camden courthouse, he spoke with Deputy Marshal Michael Pease "about the case in a manner that elicited exculpatory statements which should have been disclosed in discovery." (Doc. No. 166 at 7).

Defendant does not otherwise describe the statement, or explain how it was exculpatory or impeaching. See Strickler v. Greene, 527 U.S. 263, 281-82 (1999) ("There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."); Brady v. Maryland, 373 U.S. 83, 87 (1963). Moreover, he does not offer any authority to require the Government to disclose to a criminal defendant an exculpatory oral statement that the

20

Government does not introduce at trial.  See Fed. R. Crim. P. 16(a)(1)(A) (government must disclose defendant's oral statements made in response to interrogation "if the government intends to use the statement at trial").

Finally, D'Amario does not explain how he was prejudiced by the Government's "failure" to disclose to him an oral statement Defendant already knew about.  See United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984) ("[T]he government is not obliged under Brady to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.") (quoting United States v. Campagnuolo, 592 F.2d 852, 861 (5th Cir. 1979)); see also Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006) ("[W]here the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a Brady violation by not bringing the evidence to the attention of the defense.") (quoting United States v. Brown, 582 F.2d 197, 200 (2d Cir. 1978)); United States v. Zackson, 6 F.3d 911, 918 (2d Cir. 1993) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.") (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)).  If such an oral statement had been made, D'Amario could have elicited it during Mr. Pease's testimony or reiterated it to the jury during Defendant's testimony.  He did neither.

### G.  After-Discovered Evidence

In his Memorandum, Defendant stated that he "passionately hates NJ judges."  (Ex. G-1.) At trial, the Government called Denise Howard, who had served as Judge Irenas's Courtroom Deputy during Defendant's 2001 trial.  By the time of the instant trial, Ms. Howard was working in the Clerk's Office of the New Jersey federal court.  Ms. Howard testified that according to the

docket entries respecting Defendant's prosecution for threatening Judge DiClerico, the only judge before whom Defendant appeared was Judge Irenas. (12/12/06 Tr. at 91-92; see Ex. G-19A; Ex. G-19B.) The Government thus sought to show both that Defendant "passionately hated" Judge Irenas – the only New Jersey judge before whom he had appeared – and that Defendant intended Judge Irenas to receive the Memorandum.

Defendant testified at trial that Ms. Howard and the docket entries were incorrect: that he had also appeared before former Magistrate Judge Rosen. (12/14/06 Tr. at 133.) Defendant also testified, however, that he had intended that Judge Irenas would ultimately receive and decide Defendant's Motion and Memorandum. (12/14/06 Tr. at 96, 137-38.)

On March 23, 2007 – some three months after the instant trial concluded – Defendant submitted to me two court documents – both captioned "United States v. Arthur D'Amairo [sic]" – that apparently contradict the docket entries and may suggest that on June 2, 2003 Defendant appeared before Judge Rosen. (Doc. No. 208.)

Defendant argues that these "newly-discovered" documents warrant a new trial because they show that "the government's evidence and arguments are not accurate." (Id. at 1.) I disagree.

In reviewing a request for a new trial based on after-discovered evidence, I am obligated to apply a five-part test:

> (a) the evidence must be[,] in fact, newly discovered, i.e., discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) evidence relied on[ ] must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

22

United States v. Jasin, 280 F.3d 355, 361 (3d Cir. 2002) (quoting United States v. Iannelli, 528 F.2d 1290, 1292 (3d Cir. 1976)); United States v. Barbosa, 271 F.3d 438, 468 (3d Cir. 2001); United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000).  Defendant cannot meet this test.

Although I will accept as true Defendant's representation that he "discovered" these documents after his trial, he must have known they existed if he did actually appear before Judge Rosen.  Had he deemed this point significant, he could have subpoenaed these court records or Judge Rosen himself.  Moreover, Defendant belatedly obtained the documents from his former lawyer, an Assistant Public Defender whom Defendant initially indicated he intended to call as a trial witness. In these circumstances, I do not believe Defendant diligently sought the documents before trial.

Further, I do not believe Defendant's purported appearance before Judge Rosen is a material point.  Defendant admitted that he directed his Memorandum to Judge Irenas. (12/14/06 Tr. at 96, 137-38.)  Further, Defendant stated in the Memorandum that he passionately hates "NJ judges." (Ex. G-1 (emphasis added).)  Accordingly, establishing that Defendant also appeared before Judge Rosen simply clarifies the baleful nature of the Memorandum: that Defendant "passionately hates" both  "NJ judges" before whom he appeared – hardly a material point for the defense.

In addition, the court documents could not conceivably have produced an acquittal. Defendant contends that the Government used the discrepancy between his testimony and that of Ms. Howard to "impugn" him.  In fact, the Government did not.  In his closing argument, the prosecutor simply reminded the jury of Ms. Howard's truthful testimony that the docket entries showed that Defendant had appeared only before Judge Irenas.  (12/15/06 Tr. at 19.)  As I have

23

stated, this was not a significant point. The jury unquestionably would have convicted Defendant regardless of whether it had available documents suggesting that D'Amario may also have appeared before Judge Rosen.

Finally, the Government sets out in convincing detail why, despite its multiple searches of court records, it did not become aware of these documents until Defendant submitted them on March 23rd: the documents are captioned under an incorrectly-spelled name – "D'Amairo"; the documents do not appear in the Court's electronic filing database ("PACER"), regardless of which spelling is used; the prosecutors in this case did not participate in the purported proceeding before Judge Rosen; and the Assistant Public Defender who apparently provided the documents to Defendant refused to speak to the Government before trial. (See Doc. No. 209.)

I am satisfied that the Government acted properly. It did not fail to produce materials in its possession. On the contrary, the materials were in the possession of Defendant's former lawyer, and, presumably, the Court. In any event, I do not believe the materials are helpful to Defendant. Accordingly, the belated "discovery" of the documents does not entitle D'Amario to a new trial. See Hollman v. Wilson, 158 F.3d 177, 180-81 (3d Cir. 1998) (Government is not obligated to produce to the defendant materials not in its actual or constructive possession); United States v. Joseph, 996 F.2d 36, 39 (3d Cir. 1993) (same).

## IV.     Conclusion

In sum, I will deny D'Amario's Motion for a New Trial and Motion for Acquittal.

An appropriate Order follows.

BY THE COURT.

*/s Paul S. Diamond, J.*

_____

Paul S. Diamond, J.